**Gus McDonald**
Georgia Bar No. 488795
gus@mcdonaldcody.com
**Thomas L. Hatchett, III**
Georgia Bar No. 870086
bo@mcdonaldcody.com
**Patrick Dawson**
Georgia Bar No. 005620
pat@mcdonaldcody.com
MCDONALD & CODY
4005 Hwy 365 South
Alto, GA 30510
706-778-5291
**Motion and Application for Permission to Appear and Participate filed herewith or To Follow**
Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

JOANNA RADFORD, ERIC RADFORD, and WARREN TITUS,

Plaintiffs,

v.

ALPHA AVIATION LLC, ALASKA HELICOPTER TOURS LLC, BAILEY R. HUDSON, CHAD EMSWILER, GARY SNYDER, MICHAEL NEELY, R44 LEASING LLC, 61 NORTH HOLDINGS LLC, 783AK LLC, KEYSTONE AVIATION LLC, SANDI LARSON, MARK LARSON, and JOHN DOES NOS. 1 THROUGH 10,

Defendants.

Case No. 3:26-cv-______-____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs Joanna Radford, Eric Radford, and Warren Titus, by and through undersigned counsel, complain of Defendants Alpha Aviation LLC, Alaska Helicopter Tours LLC, Bailey R. Hudson, Chad Emswiler, Gary Snyder, Michael Neely, R44 Leasing LLC, 61 North Holdings LLC, 783AK LLC, Keystone Aviation LLC, Sandi Larson, Mark Larson, and John Does Nos. 1 through 10 as follows:

## I. NATURE OF THE ACTION

1. On August 18, 2024, a Robinson R44 II helicopter bearing Federal Aviation Administration registration number N783AK crashed while attempting to land at a remote landing zone in the Chugach Mountains near Knik Glacier, in mountainous terrain south of Mount Goode, east of Palmer, Alaska.

2. The helicopter was operated by Defendant Alpha Aviation LLC, which conducted its commercial sightseeing operations under the name "Alaska Helicopter Tours" at the time of the crash. The helicopter was owned by Alpha or by Defendant R44 Leasing LLC and was being flown as a commercial, nonscheduled sightseeing flight for hire under 14 C.F.R. Part 135. Defendant Alaska Helicopter Tours LLC was not

formed until after the crash and is named based on its role in the post-accident restructuring, continuation, ownership, or operation of the Alaska Helicopter Tours business, as alleged below.

3. Plaintiffs were fare-paying passengers on that flight. They had no control over the aircraft, the route, the choice of landing site, or the decision to attempt a landing.

4. The flight was one of a four-helicopter Alpha tour carrying twelve passengers from the Alaska Glacier Lodge, at the end of Knik River Road near Butte, up the Knik River valley, across Grasshopper Valley, and over Knik Glacier. Defendant Hudson flew the lead helicopter. When the wind hit on short final, the three pilots behind him flew out of the area. Hudson did not.

5. Alpha's own written operating procedures manual instructed its pilots not to land at the landing zone when the wind exceeded 30 knots. Alpha separately required its pilots to fly over the landing zone and determine wind direction and condition before attempting to land.

6. On the accident approach the wind was approximately 30 knots, gusting to approximately 40 knots, in terrain subject to turbulence and downdrafts.

7. The pilot in command flew a straight-in approach to the landing zone. He did not first fly over the landing zone to evaluate wind direction and condition, as Alpha's procedures required.

8. The helicopter encountered strong gusty winds and downdrafts on approach. The pilot attempted to abort the landing and could not. The helicopter lost control, struck terrain, and rolled over with Plaintiffs inside, coming to rest on its side with its tail in a small pond below the landing site.

9. The impact substantially damaged the helicopter, including its fuselage, tail boom, and main rotor drive system.

10. No preaccident mechanical failure or malfunction of the helicopter precluded its normal operation. This crash was not caused by a broken part. It was caused by the decision to attempt a landing that Alpha's own manual forbade, without the reconnaissance Alpha's own manual required.

11. Plaintiffs bring this action to recover the injuries and damages that decision caused them.

## II. PARTIES

### A. Plaintiffs

12. Plaintiff Joanna Radford is a natural person who is domiciled in and is a citizen of the State of Georgia.

13. Plaintiff Eric Radford is a natural person who is domiciled in and is a citizen of the State of Georgia.

14. Plaintiff Warren Titus is a natural person who is domiciled in and is a citizen of the State of Ohio.

15. Plaintiffs Joanna Radford and Eric Radford were married to each other on August 18, 2024 and remain married.

16. Each Plaintiff was a passenger aboard N783AK on August 18, 2024.

### B. Defendants

**Alpha Aviation LLC**

17. Defendant Alpha Aviation LLC is a limited liability company organized under the laws of the State of Alaska with its principal place of business in Alaska. For purposes of 28 U.S.C. § 1332, Alpha's citizenship is determined by the citizenship of its sole member,

Defendant 61 North Holdings LLC, as alleged in Paragraphs 40 through 50 below.

18. Alpha conducts its tour operations under the trade name "Alaska Helicopter Tours" and holds Federal Aviation Administration air carrier designator 4ZDA. Alpha holds Part 135 commuter and on-demand air taxi certificates and a Part 137 agricultural aircraft certificate.

19. At all relevant times Alpha was the operator of the accident flight and held Federal Aviation Administration operating certificates authorizing on-demand air taxi and commuter operations under 14 C.F.R. Part 135. Public federal accident records identify Alpha as the registered owner of N783AK. In the report of the accident that Alpha itself submitted to the National Transportation Safety Board, Alpha identified the registered owner as R44 Leasing LLC of Anchorage, Alaska. Alpha owned N783AK or, alternatively, operated it under a lease or similar arrangement with Defendant R44 Leasing LLC.

20. Alpha held operational control of the accident flight.

**Alaska Helicopter Tours LLC**

21. Defendant Alaska Helicopter Tours LLC is a limited liability company organized under the laws of the State of Alaska. It was formed on October 19, 2024, approximately two months after the subject crash. Its Alaska entity number is 10288719, and it is presently in good standing.

22. Alaska Helicopter Tours LLC maintains its mailing and physical address at 1842 Merrill Field Drive, Anchorage, Alaska 99501. Defendant Michael Neely is its registered agent at that same address.

23. According to its filings with the State of Alaska, the members of Alaska Helicopter Tours LLC are JHR Legacy LLC, which owns a 90 percent membership interest, and Ponderosa LLC, which owns a 10 percent membership interest. Both members are identified as Wyoming limited liability companies.

24. Because a limited liability company is a citizen of every state of which its members are citizens, the citizenship of Alaska Helicopter Tours LLC is determined by the citizenship of every member of JHR Legacy LLC and Ponderosa LLC through each level of ownership.

25. The identities and citizenship of the members of JHR Legacy LLC and Ponderosa LLC are known to Defendants but are not ascertainable by Plaintiffs from the public Alaska corporate record. On information and belief, no member of Alaska Helicopter Tours LLC, JHR Legacy LLC, or Ponderosa LLC, and no person or entity whose citizenship is attributed to any of those entities, is a citizen of Georgia or Ohio.

26. Alaska Helicopter Tours LLC adopted the exact name under which Alpha conducted the commercial sightseeing operation involved in the crash. It was formed shortly after the crash and uses an address associated with Alpha, Defendant Chad Emswiler, and Defendant Michael Neely.

27. On information and belief, Alaska Helicopter Tours LLC was formed as part of the post-accident restructuring of the Alaska Helicopter Tours enterprise and presently owns, operates, controls, receives revenue from, or holds assets, contractual rights, goodwill, trade names, customer relationships, or other interests associated with the same commercial helicopter tour business formerly or presently conducted by Alpha.

28. On information and belief, Alaska Helicopter Tours LLC shares or has shared officers, managers, members, employees, agents, facilities, equipment, customers, business operations, trade names, or controlling persons with Alpha and the other Ownership and Control Defendants.

29. Alaska Helicopter Tours LLC is sued as a successor, continuation, transferee, alter ego, or member of the same joint enterprise as Alpha, to the extent established through discovery, and for any transfers, acts, or omissions in which it directly participated after the crash.

**Bailey R. Hudson**

30. Defendant Bailey R. Hudson was the pilot in command of N783AK on the accident flight. According to the report of the accident that Alpha submitted to the National Transportation Safety Board, Hudson was 22 years of age on August 18, 2024, resided in Wasilla, Alaska, and was employed by Alpha as a pilot.

31. Hudson is a natural person who, on information and belief, is domiciled in and is a citizen of the State of Alaska, where he resided and was employed by Alpha as a commercial helicopter pilot. Hudson is

not a citizen of Georgia or Ohio, and his presence in this action does not defeat complete diversity of citizenship.

32. At all relevant times Hudson was an employee, agent, or servant of Alpha, was acting within the course and scope of that employment and agency and was acting in furtherance of Alpha's commercial business.

33. Hudson held commercial pilot and flight instructor certificates with helicopter and instrument helicopter ratings, and a second-class airman medical certificate issued November 9, 2023. He was the person who served as pilot in command of N783AK on August 18, 2024 and who reported the accident to federal authorities.

**Chad Emswiler**

34. Defendant Chad Emswiler is a natural person who, on information and belief, is domiciled in and is a citizen of the State of Alaska. On information and belief, Emswiler held an ownership interest in Alpha and occupied a senior operational role with responsibility for Alpha's flight operations, the qualification and training of Alpha's pilots, the content of Alpha's operating procedures, and the supervision and enforcement of those procedures.

35. Emswiler organized Alpha Aviation LLC in November 2016 and served as its registered agent. Alpha's biennial reports filed with the State of Alaska identified Emswiler as a 50 percent member of Alpha in 2018 and as a 90 percent member and the manager of Alpha in each report filed from 2020 through January 30, 2024. Alpha's most recent biennial report, filed February 11, 2026, again identifies Emswiler as Alpha's registered agent, at 1842 Merrill Field Drive, Anchorage, adjacent to Alpha's own address at 1844 Merrill Field Drive. On information and belief, Emswiler is also an organizer, manager, member, or authorized filer of Defendant 783AK LLC.

**Gary Snyder**

36. Defendant Gary Snyder is a natural person who, on information and belief, is domiciled in and is a citizen of the State of Alaska.

37. On information and belief, Snyder held an approximately 10 percent ownership interest in Alpha Aviation LLC from at least 2020 through at least January 30, 2024, as reflected in Alpha's biennial reports filed with the State of Alaska, and at the time of the subject crash.

38. On information and belief, in connection with that ownership interest Snyder participated in decisions concerning Alpha's operations, capitalization, insurance, operating procedures, or the qualification, training, supervision, and retention of Alpha's pilots.

**Michael Neely**

39. Defendant Michael Neely is a natural person who, on information and belief, is domiciled in and is a citizen of the State of Alaska. Neely is the General Manager of Alpha and, in that capacity, communicated with federal investigators on Alpha's behalf after the accident. On information and belief, Neely occupied a senior management and operational role with Alpha with responsibility for Alpha's pilots, flight operations, training, operating procedures, and the supervision and enforcement of those procedures.

**61 North Holdings LLC**

40. Defendant 61 North Holdings LLC is a limited liability company organized under the laws of the State of Wyoming with its principal office in Sheridan, Wyoming.

41. For the period ending December 31, 2025, 61 North Holdings LLC was identified as the sole member of Alpha Aviation LLC and the

owner of 100 percent of the membership interests in Alpha Aviation LLC.

42. Alpha's biennial report filed January 30, 2024 identified Emswiler and Snyder as Alpha's only members. Alpha's next biennial report, filed February 11, 2026, identified 61 North Holdings LLC as Alpha's sole member and manager. On information and belief, the transfer of the membership interests in Alpha to 61 North Holdings LLC occurred after the August 18, 2024 crash.

43. Wyoming law does not require a limited liability company to disclose its members in any public filing. The only member or organizer identified in the public record for 61 North Holdings LLC is Registered Agents Inc., a commercial registered agent and corporate services company.

44. The address of record for 61 North Holdings LLC, 30 N. Gould Street, Suite R, Sheridan, Wyoming, is the business address of Registered Agents Inc. On information and belief, 61 North Holdings LLC has no office, employees, or operations in Wyoming.

45. On information and belief, Registered Agents Inc. holds no beneficial ownership interest in 61 North Holdings LLC and appears in

the record as a nominee for the beneficial owners, whose identities have not been made public.

46. The identities and citizenship of the beneficial members of 61 North Holdings LLC are known to Defendants. They are not ascertainable by Plaintiffs from any public source, and Plaintiffs have made reasonable efforts before filing to determine them.

47. On information and belief, the beneficial members of 61 North Holdings LLC are natural persons domiciled in and citizens of the State of Alaska, including one or more of Defendants Chad Emswiler, Gary Snyder, Sandi Larson, Mark Larson, and Michael Neely. Each resides in Alaska, and Alpha's flight operations are directed from Alaska. The persons who owned Alpha immediately before the transfer to 61 North Holdings LLC, Emswiler and Snyder, are Alaska residents. The person who serves as Alpha's registered agent after the transfer, Emswiler, is an Alaska resident and, on information and belief, an authorized filer for Defendant 783AK LLC, the second Wyoming entity at the same Sheridan address, which holds title to the new helicopter with which Alpha now operates.

48. To the extent Registered Agents Inc. is in fact a member of 61 North Holdings LLC, it is a corporation organized under the laws of Wyoming with its principal place of business in Wyoming, and it is not a citizen of Georgia or Ohio.

49. A limited liability company is a citizen of every state of which its members are citizens. Alpha Aviation LLC and 61 North Holdings LLC are therefore each citizens of the states of which the members of 61 North Holdings LLC are citizens.

50. On information and belief, no member of 61 North Holdings LLC, and no person or entity whose citizenship is attributed to 61 North Holdings LLC or to Alpha Aviation LLC, is a citizen of Georgia or Ohio.

**783AK LLC**

51. Defendant 783AK LLC is a limited liability company organized under the laws of the State of Wyoming with its address of record at 30 N. Gould Street, Suite R, Sheridan, Wyoming 82801, the same address of record as 61 North Holdings LLC and the business address of Registered Agents Inc.

52. According to the Federal Aviation Administration Registry, 783AK LLC is the registered owner of a Robinson R44 II helicopter,

serial number 14834, manufactured in 2025, to which the registration number N783AK was reassigned after the accident aircraft, serial number 14674, was substantially damaged in the crash. The airworthiness date of the replacement helicopter is February 20, 2025, and its registration certificate was issued March 17, 2025, approximately seven months after the crash.

53. On information and belief, 783AK LLC holds title to the replacement helicopter for the use and benefit of Alpha Aviation LLC, which operates it in the same commercial sightseeing business, from the same Merrill Field location, and under the same registration number as the accident aircraft.

54. On information and belief, Defendant Chad Emswiler is an organizer, manager, member, or authorized filer of 783AK LLC.

55. Wyoming law does not require 783AK LLC to disclose its members in any public filing. The identities and citizenship of its members are known to Defendants, are not ascertainable by Plaintiffs from any public source, and Plaintiffs have made reasonable efforts before filing to determine them. On information and belief, the members of 783AK LLC are natural persons domiciled in and citizens of

the State of Alaska, including Defendant Emswiler, and no member of 783AK LLC is a citizen of Georgia or Ohio.

56. On information and belief, 61 North Holdings LLC and 783AK LLC were organized, or were put to their present use, after the August 18, 2024 crash for the purpose of separating the ownership of Alpha Aviation LLC, and the ownership of the aircraft Alpha operates, from Alpha itself and from the persons who owned Alpha at the time of the crash, and of placing both beyond the reach of Alpha's creditors, including Plaintiffs.

**R44 Leasing LLC**

57. Defendant R44 Leasing LLC is, on information and belief, a limited liability company organized under the laws of the State of Alaska with its address in Anchorage, Alaska 99501. In the report of the accident that Alpha submitted to the National Transportation Safety Board, Alpha identified R44 Leasing LLC as the registered owner of N783AK, serial number 14674, on August 18, 2024.

58. On information and belief, R44 Leasing LLC held title to the accident helicopter for the use and benefit of Alpha, furnished it to Alpha for Alpha's commercial passenger operations, and is owned and

controlled by one or more of the persons who owned or controlled Alpha at the time of the crash, including Defendant Emswiler. Its members are known to Defendants and are not ascertainable by Plaintiffs from any public source. On information and belief, the members of R44 Leasing LLC are natural persons domiciled in and citizens of the State of Alaska, and no member of R44 Leasing LLC is a citizen of Georgia or Ohio.

59. R44 Leasing LLC is sued as the owner of the accident helicopter to the extent it retained possession or control of the helicopter or participated in Alpha's operations, and, in the alternative, as an Ownership and Control Defendant on the basis alleged in Count V.

**Keystone Aviation LLC**

60. Defendant Keystone Aviation LLC is a limited liability company organized under the laws of Alaska. On information and belief, Keystone Aviation LLC holds an ownership interest in, or exercised managerial or operational control over, 61 North Holdings LLC and, through it, Alpha Aviation LLC. On information and belief, it does so through Keystone Holding LLC, an Alaska limited liability

company owned by Sandi Larson and Mark Larson. Alpha's biennial report filed with the State of Alaska on February 14, 2018 identified Keystone Aviation LLC as a 50 percent member and the manager of Alpha Aviation LLC, and listed Alpha's mailing address as 9741 Carlson Road, Anchorage, the address of Keystone Aviation LLC.

61. The sole member of Keystone Aviation LLC is Keystone Holding LLC, an Alaska limited liability company whose members are Sandi Larson and Mark Larson, each of whom is a citizen of the State of Alaska. Keystone Aviation LLC and Keystone Holding LLC are therefore citizens of Alaska. On information and belief, no member of Keystone Aviation LLC or of Keystone Holding LLC is a citizen of Georgia or Ohio.

**Sandi Larson**

62. Defendant Sandi Larson is a natural person who is domiciled in and is a citizen of the State of Alaska. On information and belief, Sandi Larson holds a beneficial ownership interest in 61 North Holdings LLC and exercised managerial or operational control over 61 North Holdings LLC and, through it, over Alpha Aviation LLC.

**Mark Larson**

63. Defendant Mark Larson is a natural person who is domiciled in and is a citizen of the State of Alaska. On information and belief, Mark Larson holds a beneficial ownership interest in 61 North Holdings LLC and exercised managerial or operational control over 61 North Holdings LLC and, through it, over Alpha Aviation LLC.

64. Defendants Alaska Helicopter Tours LLC, R44 Leasing LLC, 61 North Holdings LLC, 783AK LLC, Keystone Aviation LLC, Chad Emswiler, Gary Snyder, Sandi Larson, and Mark Larson are referred to in this Complaint as the Ownership and Control Defendants. On information and belief, they operate as a joint enterprise or joint business venture.

**John Does Nos. 1 through 10**

65. Defendants John Does Nos. 1 through 10 are persons or entities whose true names are presently unknown to Plaintiffs and whose acts or omissions caused or contributed to the crash and to Plaintiffs' injuries and damages.

66. John Does Nos. 1 through 10 include, without limitation, any other person or entity that held an ownership interest in or exercised

managerial or operational control over R44 Leasing LLC, 61 North Holdings LLC, 783AK LLC, or Alpha Aviation LLC and is not named above, and officers, managers, members, employees, or agents of Alpha Aviation LLC or 61 North Holdings LLC who bore responsibility for Alpha's operating procedures, for the qualification, training, checking, supervision, or scheduling of Alpha's pilots, or for the dispatch, flight following, or operational control of the accident flight, and any person or entity responsible for the maintenance, inspection, or airworthiness of N783AK.

67. On information and belief, each of John Does Nos. 1 through 10 is a citizen of the State of Alaska or of a state other than Georgia and Ohio. On information and belief, none of John Does Nos. 1 through 10 is a citizen of Georgia or Ohio.

68. Plaintiffs have made reasonable efforts before filing to identify these persons and entities. Their identities and their roles are known to the named Defendants and are not ascertainable by Plaintiffs from public sources. Plaintiffs will amend this Complaint to substitute their true names when their identities are ascertained.

69. Every allegation in this Complaint directed to Defendants is directed also to John Does Nos. 1 through 10, to the extent their acts or omissions caused or contributed to the crash and to Plaintiffs' injuries and damages.

## III. JURISDICTION AND VENUE

70. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). This action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

71. Complete diversity of citizenship exists. No Plaintiff is a citizen of the same State as any Defendant.

72. Plaintiff Joanna Radford seeks damages that exceed $75,000, exclusive of interest and costs.

73. Plaintiff Eric Radford seeks damages that exceed $75,000, exclusive of interest and costs.

74. Plaintiff Warren Titus seeks damages that exceed $75,000, exclusive of interest and costs.

75. This Court has personal jurisdiction over each Defendant. Alpha is organized under Alaska law and conducts its commercial aviation business in Alaska. The individual Defendants are, on

information and belief, citizens of Alaska. Every act and omission giving rise to Plaintiffs' claims occurred in Alaska. Alaska Helicopter Tours LLC is organized under Alaska law, maintains its principal business addresses in Anchorage, selected an Alaska resident as its registered agent, and, on information and belief, owns, controls, continues, or receives the benefit of commercial helicopter tour operations conducted in Alaska. 61 North Holdings LLC and 783AK LLC, although organized in Wyoming, exist to hold, respectively, the ownership of an Alaska aviation business and the aircraft that business operates in Alaska, are on information and belief managed from Alaska by Alaska residents, and have purposefully directed their activities at Alaska.

76. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because each Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

77. Alaska substantive law governs Plaintiffs' claims.

## IV. FACTUAL ALLEGATIONS

### A. The Commercial Sightseeing Flight

78. Alpha holds itself out to the public as a commercial helicopter operator offering sightseeing flights and remote landings to paying members of the public in Southcentral Alaska. Alpha bases those tours at the Alaska Glacier Lodge at the end of Knik River Road near Butte, in the Matanuska-Susitna Borough, and flies its passengers up the Knik River valley to Knik Glacier and the surrounding peaks of the Chugach Mountains.

79. On August 18, 2024, Plaintiffs purchased passage aboard an Alpha sightseeing flight, which departed as one of four Alpha helicopters, carrying twelve passengers in all, leaving the Alaska Glacier Lodge on a group tour to the mountains south of Mount Goode.

80. The flight departed the Palmer, Alaska area at approximately 12:30 p.m. local time and was to return to Palmer. The route ran up the Knik River valley, crossed Grasshopper Valley, and overflew Knik Glacier before turning toward a landing site in the mountains south of Mount Goode.

81. The aircraft was a Robinson R44 II helicopter, serial number 14674, manufactured in 2023, bearing registration number N783AK, and registered to Alpha or, according to Alpha's own report of the accident, to R44 Leasing LLC. The R44 II is a single-engine, four-seat, skid-equipped piston helicopter. At the time of the accident the airframe had accumulated fewer than 200 hours of total time in service.

82. The flight departed from the Alaska Glacier Lodge Heliport (03AN) near Palmer at approximately 12:30 p.m. carrying Hudson and the three Plaintiffs, with approximately 1.5 hours of fuel aboard, on a company VFR flight plan, with an estimated return time of 2:30 p.m. Plaintiff Titus occupied the front left passenger seat beside the pilot. Plaintiffs Joanna Radford and Eric Radford occupied the rear seats.

83. Alpha selected the aircraft, assigned the pilot, wrote the operating procedures, selected the landing zone, and retained operational control of the flight from beginning to end.

84. Plaintiffs had no aeronautical training, no access to the aircraft's controls or instruments, and no ability to evaluate the wind or the suitability of the landing zone. They depended entirely on Alpha and its pilot for their safety.

### B. Alpha's Own Operating Limitations

85. Remote helicopter landings in Alaska mountain terrain present well-known hazards, and the country around Knik Glacier, where wind pours off the icefields of the Chugach Mountains and down the Knik River valley, presents them in full measure. Those hazards include high and shifting winds, gusts, downdrafts, terrain-induced turbulence, limited escape routes, and a narrow margin for recovery once an approach has been committed.

86. Alpha knew of those hazards. It addressed them in a written operating procedures manual governing its pilots.

87. Alpha had particular reason to know them. On information and belief, in December 2023, eight months before this crash, an Alpha helicopter carrying six passengers rolled over during what Alpha itself described as a "hard, unscheduled landing" near Knik Glacier, in the southwest area of Lake George, and two of those passengers were taken to a hospital for treatment.

88. Alpha's operating procedures manual directed that its pilots not land at the landing zone when the wind exceeded 30 knots.

89. Alpha separately required its pilots to fly over the landing zone before attempting to land, in order to determine wind direction and condition.

90. Alpha's written wind limitation, which Alpha titled the "Alaska Helicopter Tours Wind Limitation SOP," set the wind limitation for tour flights in all airframes at "up to 30 knots sustained, or a gust spread of up to 15 knots," defined sustained wind as the wind measured by comparing indicated airspeed to ground speed for five seconds, and directed, in capital letters, that if a sustained wind over 30 knots or a gust spread over 15 knots was encountered at a landing zone other than base, "DO NOT LAND."

91. The same procedure directed that if wind above the limitation was encountered in flight, the pilot could land at a different landing zone only if the wind there was below the limitation on arrival, and that if the wind remained above the limitation the pilot was to cancel the next flight and a "Weather Hold" was to be activated under which each tour would be evaluated "Go or No Go" before its scheduled departure. It further directed the pilot to contact "operational control"

to request cancellation when weather was forecast to remain above the limitation, and to notify the "base manager."

92. Alpha therefore maintained, on paper, a system of operational control over wind decisions that did not depend on the judgment of a single pilot on short final to a mountain landing zone. On information and belief, that system was not followed on August 18, 2024. No Weather Hold was activated, and Alpha continued to dispatch tour flights, including a second Alpha helicopter that was following the accident helicopter toward the same landing area, in wind that Alpha's own pilot had reported to his passengers as approximately 30 knots.

93. Those two requirements existed for a reason. Together they were meant to keep an Alpha helicopter from being committed to a landing in wind it could not safely handle.

94. Alpha's pilots were required to know and to follow those requirements.

95. Alpha, Emswiler, and Neely were responsible for training Alpha's pilots on those requirements, for confirming that Alpha's pilots understood them, for supervising compliance with them, and for enforcing them.

96. After the accident, Alpha's General Manager, Defendant Neely, confirmed in writing to federal investigators that all Alpha pilots are trained to conduct a reconnaissance of the landing zone before landing, and that a reconnaissance should have been completed on the accident approach instead of a straight-in approach, both to confirm wind direction and to ensure that the helicopter was within Alpha's wind limitation.

97. In its own written report of the accident, Alpha identified the means by which the accident could have been prevented as "further enforcement on pilot reconnaissance of area to reveal wind conditions." Alpha thereby acknowledged that its enforcement of the reconnaissance requirement was inadequate before the accident.

## C. The Approach and the Crash

98. Conditions in the area of the landing zone on August 18, 2024 were visual meteorological conditions in daylight, with a broken cloud layer above the terrain and terrain-induced turbulence. It was windy in Palmer that day. Alpha nonetheless dispatched four helicopters up the Knik valley toward a mountain landing zone.

99. The wind at the time of the accident was approximately 30 knots with gusts to approximately 40 knots.

100. According to Alpha's own report of the accident, the wind direction at the landing zone was variable, the helicopter was loaded to approximately 2,465 pounds against a maximum certificated gross weight of 2,500 pounds, and the density altitude was approximately 2,866 feet. The helicopter was therefore operating near the limit of its certificated weight, with a correspondingly narrow power margin for arresting a descent in a downdraft or for aborting an approach.

101. During the flight toward the landing area, the pilot told his passengers that the helicopter was flying into an approximately 30-knot headwind.

102. The pilot therefore knew, before he began the approach, that the helicopter was operating in wind at or above the limit at which Alpha's manual directed him not to land.

103. The pilot flew a straight-in approach to the remote landing zone.

104. The landing zone was a location known to Alpha and used by Alpha in its tour operations, a bench at an elevation of approximately 2,800 feet in the mountains south of Mount Goode, above Knik Glacier.

105. He did not first fly over the landing zone to determine wind direction and condition.

106. Had he flown the reconnaissance Alpha required, he would have obtained the information that requirement was designed to give him, including the actual wind direction and velocity at the landing zone, the presence and severity of gusts, downdrafts, and turbulence, the available escape routes, and whether conditions were within or outside Alpha's operating limitations.

107. He attempted the landing anyway.

108. On approach the helicopter encountered strong gusty winds and downdrafts. Alpha's General Manager, Defendant Neely, later described what the helicopter met on short final as "at least a 30- to 40-knot wind shear."

109. The pilot attempted to abort the landing. By then the helicopter was committed and the attempt failed. By Neely's own account, Hudson was by then too low to abort. The three Alpha pilots

behind him, meeting the same wind, were able to fly out of the immediate area.

110. According to Alpha's own report of the accident, when Hudson attempted to abort the landing he flew approximately 200 to 300 feet toward a lower location, where the helicopter landed hard and tipped over. Neely described this as the pilot having "elected to do a hard landing," after which the helicopter tipped onto its side and came to rest with its tail in a small pond below the landing site.

111. The helicopter lost control, struck terrain, and rolled over.

112. The airframe sustained substantial damage, including damage to the fuselage, the tail boom, and the main rotor drive system.

113. Hudson got the passengers out of the wreckage and activated an emergency alert. Another Alpha helicopter later landed nearby and flew Plaintiffs back down the Knik River valley to the Alaska Glacier Lodge.

114. No preaccident mechanical failure or malfunction of the helicopter precluded its normal operation.

115. The crash resulted from the decision to attempt the landing and from the manner in which the helicopter was flown, not from any presently known defect in the aircraft.

116. The crash was caused by Hudson's failure to follow Alpha's operating procedures manual and his attempt to land at a remote landing zone in high wind conditions.

117. Contributing to the crash was Hudson's decision not to conduct a flyover of the landing site to determine wind condition, which resulted in a loss of control during landing.

**D. Plaintiffs' Injuries and Damages**

118. Plaintiffs were restrained in passenger seats inside the helicopter when it lost control, struck terrain, and rolled over.

119. Plaintiffs experienced the approach, the loss of control, the impact, and the rollover, and were exposed throughout to an immediate risk of serious bodily injury and death on a mountainside above Knik Glacier, in terrain reachable only by air and far from medical care.

120. Plaintiff Joanna Radford sustained bodily injuries in the crash and incurred medical bills.

121. As a direct and proximate result of Defendants' conduct, Joanna Radford has suffered and will continue to suffer bodily injury, physical pain and suffering, mental anguish and emotional distress, medical and related expenses, loss of enjoyment of life, and other damages to be proven at trial.

122. Plaintiff Eric Radford was aboard the helicopter throughout the crash sequence, was within the zone of physical danger created by Defendants' conduct, was subjected to the physical forces of the impact and rollover, and reasonably feared imminent serious bodily injury and death.

123. As a direct and proximate result of Defendants' conduct, Eric Radford has suffered and will continue to suffer severe shock, fright, mental anguish, and emotional distress, together with the consequences of that distress.

124. Plaintiff Warren Titus was aboard the helicopter throughout the crash sequence, was within the zone of physical danger created by Defendants' conduct, was subjected to the physical forces of the impact and rollover and reasonably feared imminent serious bodily injury and death.

125. As a direct and proximate result of Defendants' conduct, Warren Titus has suffered and will continue to suffer severe shock, fright, mental anguish, and emotional distress, together with the consequences of that distress.

126. Plaintiffs' injuries were a foreseeable consequence of attempting a remote helicopter landing in wind outside the operator's own limits without the reconnaissance the operator's own procedures required.

**E. The Post-Accident Restructuring**

127. At the time of the crash, Alpha Aviation LLC was owned, according to its most recent report filed with the State of Alaska, 90 percent by Emswiler and 10 percent by Snyder. Public federal accident records list Alpha as the registered owner of N783AK, serial number 14674, while Alpha's own report of the accident lists R44 Leasing LLC of Anchorage. The practice of holding the aircraft in an entity separate from the operating company therefore predates the crash. What changed after the crash is that both the aircraft-holding entity and the ownership of Alpha were moved to Wyoming entities at a nominee address.

128. After the crash, and before Alpha's next biennial report was filed on February 11, 2026, 100 percent of the membership interests in Alpha were transferred to 61 North Holdings LLC, a Wyoming limited liability company whose only publicly identified member is a commercial registered agent and whose address of record is that registered agent's office in Sheridan, Wyoming.

129. Within seven months of the crash, a replacement Robinson R44 II, serial number 14834, was placed in service under the same registration number, N783AK. Title to that helicopter was placed not in Alpha but in 783AK LLC, a second Wyoming limited liability company at the same Sheridan address.

130. Emswiler, who owned 90 percent of Alpha when it crashed, remained after the restructuring as Alpha's registered agent of record and, on information and belief, as an organizer, manager, member, or authorized filer of 783AK LLC.

131. After the crash, Alaska Helicopter Tours LLC was formed as an Alaska limited liability company on October 19, 2024. The entity took the exact name under which Alpha had conducted the commercial sightseeing operation involved in the crash.

132. Alaska Helicopter Tours LLC maintains its mailing and physical address at 1842 Merrill Field Drive in Anchorage. That address is immediately adjacent to Alpha's address at 1844 Merrill Field Drive and is also associated with Defendants Emswiler and Neely.

133. Alaska Helicopter Tours LLC identifies JHR Legacy LLC and Ponderosa LLC, both Wyoming limited liability companies, as its 90 percent and 10 percent members, respectively. This ownership division mirrors the 90 percent and 10 percent ownership interests previously reported for Emswiler and Snyder in Alpha.

134. On information and belief, the use of two Wyoming limited liability companies holding 90 percent and 10 percent membership interests in Alaska Helicopter Tours LLC is not coincidental but reflects a continuation or restructuring of the ownership interests previously held in Alpha.

135. On information and belief, assets, business opportunities, contractual rights, customer relationships, goodwill, revenue, trade names, or other interests associated with Alpha's Alaska Helicopter Tours operation were transferred to or placed under the control of Alaska Helicopter Tours LLC after the crash.

136. The terms, timing, consideration, and purpose of those transfers, and the identities of the persons who own and control JHR Legacy LLC and Ponderosa LLC, are within Defendants' exclusive possession and cannot be fully determined without discovery.

137. On information and belief, Alpha now holds no aircraft in its own name and conducts its operations with aircraft owned by 783AK LLC, so that the revenue-producing assets of the enterprise are held in one Wyoming entity and the ownership of the operating company in another, while the operations, the personnel, the location, and the persons in control remain unchanged.

138. The facts alleged in this Section are drawn from the public filings of the State of Alaska and the Federal Aviation Administration. The terms of the transfers, the consideration paid, and the identities of the persons who directed them are within Defendants' exclusive possession.

## COUNT I

## NEGLIGENCE

## (Against Defendant Bailey R. Hudson, Pilot in Command)

139. Plaintiffs reallege and incorporate paragraphs 1 through 138 as if fully set forth here.

140. As the pilot in command of a commercial flight carrying passengers for hire, Hudson owed Plaintiffs a duty to exercise reasonable care in the operation of the helicopter for their safety.

141. That duty was informed by the Federal Aviation Regulations governing his operation of the aircraft, including 14 C.F.R. § 91.3(a), which charges the pilot in command with final authority and responsibility for the operation of the aircraft, and 14 C.F.R. § 91.13(a), which prohibits operating an aircraft in a careless or reckless manner so as to endanger the life or property of another.

142. Hudson was also required to comply with Alpha's operating procedures manual and the limitations it imposed.

143. Hudson breached the duty he owed Plaintiffs. He was negligent in one or more of the following respects.

(a) He attempted to land at a remote landing zone in wind at or above the 30-knot limit at which Alpha's operating procedures manual directed him not to land.

(b) He failed to fly over the landing zone before attempting to land, as Alpha's procedures required, and so deprived himself of the information necessary to evaluate wind direction and condition at the landing site.

(c) He flew a straight-in approach to a remote mountain landing zone without adequately assessing wind, gusts, downdrafts, turbulence, or escape routes.

(d) He failed to recognize that conditions were outside Alpha's operating limitations and to decline the landing on that basis.

(e) He continued the approach past the point at which it could safely be abandoned.

(f) He failed to maintain control of the helicopter.

(g) He exercised unreasonable aeronautical decision-making and judgment for the conditions he faced.

(h) He operated the helicopter in a careless and reckless manner that endangered the lives of his passengers.

(i) He otherwise failed to exercise the care that a reasonably prudent commercial helicopter pilot would have exercised under the same circumstances.

144. Each of those breaches, singly and in combination, was a direct and proximate cause of the crash and of Plaintiffs' injuries and damages.

145. Plaintiffs are entitled to recover from Hudson all damages allowed by law.

## COUNT II

## VICARIOUS LIABILITY

## (Against Defendant Alpha Aviation LLC)

146. Plaintiffs reallege and incorporate paragraphs 1 through 145 as if fully set forth here.

147. Hudson was Alpha's employee, agent, or servant.

148. He was flying Alpha's helicopter, carrying Alpha's paying customers, to a landing zone Alpha had selected, under procedures Alpha had written, in furtherance of Alpha's commercial business, and within the course and scope of his employment and agency.

149. Alpha is vicariously liable for the negligent acts and omissions of Hudson under the doctrine of respondeat superior and other applicable principles of agency law.

150. Alpha also held operational control of the accident flight and is responsible for the manner in which that flight was conducted.

151. At all relevant times Alpha held itself out and undertook to transport passengers for hire, including Plaintiffs, in its Part 135 sightseeing operations. Alpha was therefore a common carrier and owed its passengers a duty of utmost care and the vigilance of a very cautious person. It was responsible for even the slightest negligence and was required to exercise all human care, vigilance, and foresight reasonably possible under the circumstances.

152. As a direct and proximate result of the negligence for which Alpha is answerable, Plaintiffs sustained the injuries and damages alleged in this Complaint.

## COUNT III

## DIRECT NEGLIGENCE

## (Against Defendant Alpha Aviation LLC)

153. Plaintiffs reallege and incorporate paragraphs 1 through 152 as if fully set forth here.

154. Independent of its vicarious liability, Alpha owed Plaintiffs a direct duty to exercise reasonable care in the conduct of its commercial air tour operation.

155. That duty included the exercise of reasonable care in selecting, qualifying, training, checking, supervising, and retaining the pilots to whom Alpha entrusted paying passengers, and in implementing and enforcing the operating procedures Alpha itself wrote.

156. Alpha knew that its remote landing operations exposed passengers to serious risk if a pilot landed in excessive wind or skipped the required reconnaissance. That is why Alpha wrote the rules it wrote.

157. A procedure that an operator does not train, check, supervise, and enforce is not a safety procedure. It is a piece of paper.

158. Alpha breached its duty to Plaintiffs. Alpha was negligent in one or more of the following respects.

(a) It failed to adequately train Hudson on remote landing zone operations in Alaska mountain terrain.

(b) It failed to adequately train Hudson on its wind limitation for the landing zone.

(c) It failed to adequately train Hudson on the required landing zone overflight and reconnaissance.

(d) It failed to confirm that Hudson understood those requirements and would comply with them before assigning him to carry passengers to remote landing zones.

(e) It failed to verify that Hudson satisfied the currency, qualification, competency, and proficiency requirements applicable to his operation of a Robinson R44 in Part 135 passenger-carrying service.

(f) It failed to reasonably supervise Hudson's conduct of remote landing operations.

(g) It failed to monitor and to enforce compliance with its own operating limitations and procedures.

(h) It maintained no adequate system for detecting or correcting pilot deviations from its wind and reconnaissance requirements.

(i) It failed to exercise reasonable operational control over the accident flight, including with respect to the decision to dispatch and to continue the flight in the prevailing wind conditions.

(j) It retained Hudson in passenger-carrying service when reasonable care would have disclosed that he would not reliably comply with Alpha's remote landing procedures.

(k) It otherwise failed to conduct its commercial air tour operation with reasonable care.

159. Alpha's own negligence was a direct and proximate cause of the crash and of Plaintiffs' injuries and damages.

**COUNT IV**

**NEGLIGENT ENTRUSTMENT, HIRING, TRAINING, SUPERVISION, AND RETENTION**

**(Against Defendant Alpha Aviation LLC)**

160. Plaintiffs reallege and incorporate paragraphs 1 through 159 as if fully set forth here.

161. Alpha undertook to carry Plaintiffs as passengers for hire. As a common carrier, Alpha owed them a duty of utmost care and the vigilance of a very cautious person, was responsible for even the slightest negligence, and was required to do all that human care, vigilance, and foresight reasonably could do under the circumstances.

162. That duty governed Alpha's selection, hiring, qualification, training, checking, supervision, and retention of the pilots to whom it entrusted its aircraft and its passengers. It governed as well Alpha's decision to entrust N783AK, and the lives of the three Plaintiffs aboard it, to Hudson for the accident flight.

## A. The Standards Alpha Was Required to Meet

163. Alpha held Federal Aviation Administration operating certificates authorizing on-demand air taxi and commuter operations under 14 C.F.R. Part 135, and it conducted the accident flight under that authority.

164. A certificate holder conducting operations under Part 135 must establish and maintain an approved training program for its pilots. 14 C.F.R. §§ 135.321 through 135.351.

165. A certificate holder must ensure that each pilot in command satisfies the qualification and experience requirements applicable to the operation being conducted. 14 C.F.R. § 135.243.

166. A certificate holder may not use a pilot unless, since the beginning of the twelfth calendar month before that service, the pilot has passed a competency check in that type of aircraft, in the case of a helicopter, and may not use a pilot in command unless, within the same period, the pilot has passed a line check in one of the types of aircraft the pilot is to fly. 14 C.F.R. §§ 135.293, 135.299.

167. A certificate holder must maintain records demonstrating that each pilot has satisfied those training, testing, and qualification requirements. 14 C.F.R. § 135.63.

168. A certificate holder must employ qualified management personnel, including a director of operations and a chief pilot, who are responsible for the conduct and the supervision of its flight operations. 14 C.F.R. §§ 119.69, 119.71.

169. A person may not act as pilot in command of a Robinson R-44 helicopter unless that person has satisfied the additional training, experience, and currency requirements of Special Federal Aviation

Regulation No. 73, which the Federal Aviation Administration adopted because of the accident history of that aircraft type. Those requirements include awareness training addressing energy management, mast bumping, low rotor revolutions per minute and rotor stall, low-G conditions and the proper recovery from them, and rotor revolutions per minute decay, and they provide that no flight review completed under 14 C.F.R. § 61.56 by a pilot eligible to act as pilot in command of a Robinson R-44 is valid for the operation of an R-44 unless that flight review was taken in an R-44.

170. Each of those requirements exists to keep an unqualified, uncurrent, or inadequately trained pilot out of the front seat of a passenger-carrying helicopter. Compliance with them was Alpha's obligation, not Hudson's alone.

**B. The Pilot Alpha Entrusted With the Flight**

171. On information and belief, on August 18, 2024 Hudson was 22 years of age.

172. On information and belief, Hudson had accumulated approximately 1,416 hours of total flight time, of which approximately 965 hours were in the Robinson R44 make and model.

173. On information and belief, Hudson had flown approximately 72 hours in the 90 days preceding the accident, approximately 14 hours in the 30 days preceding the accident, and no hours in the 24 hours preceding the accident.

174. On information and belief, the most recent flight review or equivalent reflected in Hudson's records was completed on or about February 2, 2023, more than eighteen months before the accident flight, and was conducted in an Airbus AS350 helicopter rather than in a Robinson R44. Under Special Federal Aviation Regulation No. 73, a flight review taken in an Airbus AS350 is not valid for the operation of a Robinson R-44. In its own report of the accident, Alpha identified that February 2, 2023 event as the most recent flight review or equivalent, including any Part 135 check, in Hudson's records. On information and belief, Alpha did not administer to Hudson the competency check required by 14 C.F.R. § 135.293 or the line check required by 14 C.F.R. § 135.299 within the twelve calendar months preceding the accident.

175. On information and belief, Alpha did not confirm, before dispatching the accident flight, that Hudson satisfied the currency, competency, and proficiency requirements applicable to a pilot in

command carrying passengers for hire in a Robinson R-44 under Part 135, including the Robinson-specific requirements of Special Federal Aviation Regulation No. 73 and the competency and line check requirements of 14 C.F.R. §§ 135.293 and 135.299.

176. On information and belief, Alpha did not adequately evaluate Hudson's experience, judgment, or aeronautical decision-making before assigning him to conduct remote mountain landings with paying passengers aboard.

**C. Alpha's Own Directives, and What Alpha Did With Them**

177. Alpha's operating procedures manual directed its pilots not to land at the landing zone when the wind exceeded 30 knots.

178. Alpha separately required its pilots to fly over the landing zone to determine wind direction and condition before attempting to land.

179. Those directives were Alpha's own. No regulator imposed them. Alpha wrote them because Alpha knew that attempting a remote landing in mountainous Alaska terrain in high wind, without first determining the wind at the site, would place its passengers in danger of exactly the outcome that occurred.

180. A directive that an operator writes but does not train its pilots on, does not test its pilots against, does not monitor its pilots for, and does not enforce when its pilots depart from it protects no passenger. It is a document, not a safety procedure.

181. On information and belief, Alpha did not adequately train Hudson on either directive, did not test his understanding of either directive, did not monitor his compliance with either directive, and maintained no system that would have detected or corrected a departure from either directive.

182. On information and belief, the departure from those directives on the accident flight was not an isolated act of a single pilot but reflected Alpha's failure to instill, check, and enforce compliance across its pilot group.

**D. The Entrustment**

183. Alpha owned or held under lease from R44 Leasing LLC and had the exclusive right to possess and control, N783AK, a single-engine, four-seat, skid-equipped Robinson R44 II helicopter with a maximum certificated gross weight of 2,500 pounds.

184. Alpha entrusted that helicopter, and the lives of the three fare-paying Plaintiffs aboard it, to Hudson for a landing at a remote landing zone in mountainous terrain.

185. Alpha did so when the wind in the area of the landing zone was approximately 30 knots with gusts to approximately 40 knots, in terrain-induced turbulence of moderate severity, and when the flight departed as part of a group of helicopters leaving a nearby lodge, so that Alpha and its other personnel had the same information about the conditions that day.

186. Alpha knew or in the exercise of reasonable care should have known that Hudson was likely to attempt a landing outside Alpha's stated wind limitation and without the reconnaissance Alpha required, and that entrusting the helicopter and its passengers to him for that operation in those conditions created an unreasonable risk of serious harm.

187. Alpha retained Hudson in passenger-carrying service and assigned him to remote landing operations notwithstanding that risk.

## E. Breach

188. Alpha breached the duties it owed Plaintiffs. Alpha was negligent in one or more of the following respects.

(a) It entrusted N783AK and its fare-paying passengers to a pilot it knew or should have known was likely to operate the helicopter in a manner creating an unreasonable risk of harm on a remote mountain landing.

(b) It hired, qualified, and assigned Hudson to passenger-carrying remote landing operations without adequately evaluating his experience, currency, judgment, and aeronautical decision-making.

(c) It failed to provide adequate initial and recurrent training on remote landing zone operations in mountainous Alaska terrain.

(d) It failed to provide adequate training on its own wind limitation for the landing zone.

(e) It failed to provide adequate training on its own landing zone overflight and reconnaissance requirement.

(f) It failed to provide adequate training on recognizing, avoiding, and escaping high wind, gusts, downdrafts, terrain-induced turbulence, and windshear on approach to a remote site.

(g) It failed to administer or to document the competency check, line check, and Robinson-specific training and currency requirements applicable to Hudson.

(h) It failed to confirm that Hudson understood its directives and would comply with them before assigning him to carry passengers to remote landing zones.

(i) It failed to reasonably supervise Hudson's conduct of remote landing operations.

(j) It failed to exercise reasonable operational control over the accident flight, including with respect to the decision to dispatch and to continue the flight in the prevailing wind conditions.

(k) It failed to monitor and to enforce compliance with its own operating limitations and procedures.

(l) It maintained no adequate system for detecting or correcting pilot deviations from its wind and reconnaissance requirements.

(m) It failed to employ, or failed to make effective use of, the qualified management personnel responsible under 14 C.F.R. §§ 119.69 and 119.71 for the conduct and supervision of its flight operations.

(n) It retained Hudson in passenger-carrying service when reasonable care would have disclosed that he would not reliably comply with Alpha's remote landing procedures.

(o) It otherwise failed to exercise the care required of a common carrier in the selection, training, supervision, retention, and equipping of the pilots to whom it entrusted its passengers.

189. Each of those breaches, singly and in combination, was a direct and proximate cause of the crash and of Plaintiffs' injuries and damages.

**COUNT V**

**NEGLIGENCE, SUCCESSOR, TRANSFEREE, JOINT-ENTERPRISE, AND ALTER-EGO LIABILITY**

**(Against the Ownership and Control Defendants)**

190. Plaintiffs reallege and incorporate paragraphs 1 through 189 as if fully set forth here.

191. 61 North Holdings LLC owns 100 percent of the membership interests in Alpha Aviation LLC and is its sole member.

192. 783AK LLC holds title to the new helicopter with which Alpha conducts the operations at issue, at the same nominee address as 61 North Holdings LLC.

193. On information and belief, R44 Leasing LLC held title to the accident helicopter and furnished it to Alpha for the accident flight.

194. On information and belief, the remaining Ownership and Control Defendants held ownership interests in Alpha Aviation LLC or in 61 North Holdings LLC or exercised managerial or operational control over one or both of them.

195. Alaska Helicopter Tours LLC was formed after the crash, adopted the exact name under which Alpha conducted the subject tour operation, maintains an address associated with Alpha's management, and, on information and belief, owns, controls, continues, or receives the benefit of some or all of the same commercial helicopter tour business.

196. On information and belief, Alaska Helicopter Tours LLC is a continuation or successor of the Alaska Helicopter Tours business conducted by Alpha, received assets or business interests from Alpha or persons controlling Alpha, participates in the same joint enterprise, or

is operated as an alter ego or instrumentality of the same controlling persons and entities.

197. Ownership alone does not make any of the Ownership and Control Defendants answerable for Alpha's conduct. Plaintiffs plead this Count on the basis of the control each of them exercised and, in the alternative, on the basis that Alpha was operated as their instrumentality.

198. On information and belief, the Ownership and Control Defendants exercised control over or participated in Alpha's business or its continuation, including its management, capitalization, insurance, personnel, assets, aircraft, revenue, trade names, customer relationships, and safety and operational policies.

199. On information and belief, one or more of the Ownership and Control Defendants shares officers, managers, or decision makers with Alpha, including Defendants Emswiler and Neely.

200. To the extent any Ownership and Control Defendant participated in establishing, approving, funding, implementing, or failing to enforce the operating policies governing Alpha's remote landing operations, or in decisions concerning the qualification,

training, staffing, supervision, or retention of Alpha's pilots, that Defendant owed a duty of reasonable care to the passengers Alpha carried, including Plaintiffs, and breached that duty in the respects alleged in Count III.

201. In the alternative, and on information and belief, Alpha Aviation LLC was operated as the alter ego and mere instrumentality of one or more of the Ownership and Control Defendants. There is a unity of interest and ownership between them such that they do not have separate existences in fact, and observing the fiction of separate existence under these circumstances would sanction injustice to Plaintiffs.

202. The post-accident restructuring alleged in Section IV.E—including the formation of Alaska Helicopter Tours LLC under Alpha's preexisting trade name, the placement of Alpha's ownership in one Wyoming entity, the placement of the replacement aircraft in another Wyoming entity, and the use of additional Wyoming entities to own Alaska Helicopter Tours LLC while the operations, location, personnel, and controlling persons allegedly remained substantially unchanged—is evidence of continuity, unity of interest, and the use of formally

separate entities to shield the enterprise and its assets from Alpha's liabilities.

203. The facts bearing on those relationships, including Alpha's capitalization and insurance, the observance of company formalities, the commingling of funds and personnel, and the flow of revenue from Alpha's operations, are within Defendants' exclusive possession.

204. To the extent Alpha or any person controlling Alpha transferred assets, contractual rights, revenue, goodwill, trade names, customer relationships, or business opportunities to Alaska Helicopter Tours LLC without reasonably equivalent value or for the purpose or with the effect of placing those interests beyond the reach of Alpha's creditors, Alaska Helicopter Tours LLC is liable to the extent permitted by Alaska law as a transferee and participant in that transaction.

205. To the extent Alaska Helicopter Tours LLC constitutes a mere continuation or successor of Alpha's Alaska Helicopter Tours business, expressly or impliedly assumed Alpha's liabilities, resulted from a transaction intended to avoid those liabilities, or operates without meaningful separation from Alpha and the persons controlling

Alpha, it is answerable for the liabilities alleged in this Complaint to the extent permitted by Alaska law.

206. Each Ownership and Control Defendant is liable to Plaintiffs for its or their own negligent acts and omissions and, in the alternative, as the alter ego of Alpha Aviation LLC.

**COUNT VI**

**NEGLIGENCE**

**(Against Defendant Chad Emswiler)**

207. Plaintiffs reallege and incorporate paragraphs 1 through 206 as if fully set forth here.

208. Alaska law does not immunize a corporate officer, manager, or member from liability for a tort he personally commits, even when he commits it within the course and scope of his employment. Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc., 355 P.3d 503 (Alaska 2015).

209. Plaintiffs do not seek to hold Emswiler liable for the obligations of Alpha by reason of his membership or office. Plaintiffs seek to hold Emswiler liable for his own conduct.

210. On information and belief, Emswiler personally exercised authority and responsibility over Alpha's flight operations, over the qualification, training, and checking of Alpha's pilots, over the content of Alpha's operating procedures manual, and over the supervision and enforcement of the limitations that manual imposed.

211. In personally performing those functions, Emswiler owed a duty of reasonable care to the passengers Alpha carried, including Plaintiffs.

212. On information and belief, Emswiler personally failed to exercise reasonable care in performing those functions, including by failing to ensure that Alpha's pilots were trained on, checked on, supervised in, and held to the wind limitation and the reconnaissance requirement applicable to remote landing zone operations.

213. Emswiler knew or reasonably should have known that a failure to do so exposed Alpha's passengers to a risk of precisely the kind of accident that occurred here.

214. Emswiler's own negligent acts and omissions were a direct and proximate cause of the crash and of Plaintiffs' injuries and damages.

## COUNT VII

## NEGLIGENCE

## (Against Defendant Michael Neely)

215. Plaintiffs reallege and incorporate paragraphs 1 through 214 as if fully set forth here.

216. Plaintiffs do not seek to hold Neely liable for the obligations of Alpha by reason of his office. Plaintiffs seek to hold Neely liable for his own conduct.

217. On information and belief, Neely personally exercised authority and responsibility over Alpha's pilots, over Alpha's flight operations, over pilot training and supervision, and over the implementation and enforcement of Alpha's operating procedures.

218. In personally performing those functions, Neely owed a duty of reasonable care to the passengers Alpha carried, including Plaintiffs.

219. On information and belief, Neely personally failed to exercise reasonable care in performing those functions, including by failing to ensure that Alpha's pilots were trained on, checked on, supervised in, and held to the wind limitation and the reconnaissance requirement applicable to remote landing zone operations.

220. Neely knew or reasonably should have known that a failure to do so exposed Alpha's passengers to a risk of precisely the kind of accident that occurred here.

221. Neely's own negligent acts and omissions were a direct and proximate cause of the crash and of Plaintiffs' injuries and damages.

## COUNT VIII

## RES IPSA LOQUITUR

## (Pleaded in the Alternative Against Defendants Responsible for the Ownership, Operation, Control, Dispatch, Maintenance, or Flight of N783AK on August 18, 2024)

222. Plaintiffs reallege and incorporate paragraphs 1 through 221 as if fully set forth here.

223. This Count is pleaded in the alternative, to the extent any Defendant disputes the specific acts and omissions of negligence alleged above.

224. A helicopter operated by a commercial air carrier does not ordinarily lose control, strike terrain, and roll over during a landing in the absence of negligence.

225. At all relevant times the helicopter, its maintenance, its dispatch, its route, its landing zone, and its operation were within the exclusive control of Defendants.

226. Plaintiffs were fare-paying passengers who did nothing to cause or to contribute to the crash.

227. The evidence bearing on the cause of the crash is within Defendants' possession and control.

228. Plaintiffs are entitled to an inference that the crash resulted from Defendants' negligence.

## COUNT IX

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**(Against All Defendants on Behalf of All Plaintiffs)**

229. Plaintiffs reallege and incorporate paragraphs 1 through 228 as if fully set forth here.

230. Alpha accepted Joanna Radford, Eric Radford, and Warren Titus as fare-paying passengers and undertook by contract to carry each of them safely. That relationship existed before the negligent conduct that caused the crash.

231. Alaska permits recovery for negligent infliction of emotional distress without proof of physical injury where the defendant owed the plaintiff a preexisting contractual or fiduciary duty to refrain from conduct presenting a foreseeable and unreasonable risk of causing emotional distress.

232. The carrier-passenger relationship between Alpha and Joanna Radford, Eric Radford, and Warren Titus imposed such a duty. Serious emotional harm is a foreseeable consequence of negligently exposing a passenger to a helicopter crash in remote mountain terrain.

233. Joanna Radford, Eric Radford, and Warren Titus were additionally within the zone of physical danger. Each was inside the helicopter when it lost control, struck terrain, and rolled over, and each was subjected to the physical forces of that impact.

234. The resulting emotional distress suffered by Joanna Radford, Eric Radford, and Warren Titus is serious and severe. It is not temporary disappointment, regret, or ordinary upset.

235. Defendants' negligence was a direct and proximate cause of that distress.

236. In the alternative, each Plaintiff asserts this Count on the same grounds.

237. Joanna Radford, Eric Radford, and Warren Titus are each entitled to recover for those injuries to the full extent permitted by Alaska law.

**COUNT X**

**LOSS OF CONSORTIUM**

**(Against All Defendants)**

238. Plaintiffs reallege and incorporate paragraphs 1 through 237 as if fully set forth here.

239. Joanna Radford and Eric Radford were married to each other on August 18, 2024, were married at the time of the injuries alleged, and remain married.

240. Alaska recognizes a spouse's claim for loss of consortium arising from injuries negligently inflicted on the other spouse.

241. In the alternative, and to the extent the injuries sustained by their spouse support such a claim under Alaska law, Joanna and Eric Radford have suffered and will continue to suffer the loss of his or her spouse's society, companionship, comfort, affection, and services.

242. As a direct and proximate result of Defendants' acts and omissions and of the injuries sustained by their spouse, Joanna and Eric Radford have suffered and will continue to suffer the loss of his or her spouse's society, companionship, comfort, affection, and services.

243. This consortium claim is joined with the underlying cause of action, as Alaska law requires.

**COUNT XI**

**PUNITIVE DAMAGES**

**(Against All Defendants)**

244. Plaintiffs reallege and incorporate paragraphs 1 through 243 as if fully set forth here.

245. Under AS 09.17.020(b), a fact finder may award punitive damages upon clear and convincing evidence that the defendant's conduct was outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interest of another person.

246. Alpha wrote a rule directing its pilots not to land at the landing zone in wind over 30 knots. Alpha wrote a second rule requiring its pilots to overfly the landing zone first. On information and belief,

Hudson knew both rules, knew before he began the approach that the wind was at or above the limit, and attempted the landing anyway without performing the reconnaissance.

247. On information and belief, Alpha had already had one helicopter roll over with passengers aboard near Knik Glacier in December 2023, and had not, in the eight months that followed, enforced its wind limitation and reconnaissance requirement in a manner that kept its pilots from committing to mountain landings in wind above its own limit. Its own post-accident recommendation, "further enforcement on pilot reconnaissance," concedes as much.

248. Conduct of that character, if proven as alleged, reflects a conscious decision to accept a known and serious risk to three paying passengers who had no means of protecting themselves.

249. On information and belief, and subject to discovery, Alpha, Emswiler, and Neely knew or had reason to know that Alpha pilots were not reliably complying with the wind limitation and the reconnaissance requirement and failed to act.

250. Plaintiffs seek punitive damages against each Defendant whose own conduct, or conduct legally attributable to that Defendant, is

shown to satisfy the standard of AS 09.17.020(b), in an amount to be determined under AS 09.17.020.

## V. DAMAGES

251. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have suffered and will continue to suffer damages, as applicable to each Plaintiff, including the following.

(a) Past and future physical pain and suffering.

(b) Past and future mental anguish, emotional distress, fear, and anxiety.

(c) Past and future medical, psychological, counseling, and related expenses.

(d) Past and future lost income and impairment of earning capacity.

(e) Physical impairment and disability.

(f) Loss of enjoyment of life.

(g) Loss of consortium.

(h) Incidental and consequential damages.

(i) All other compensatory damages recoverable under Alaska law.

252. Plaintiffs reserve the right to amend and supplement these allegations as discovery and medical evaluation continue.

253. Plaintiffs are entitled to prejudgment and postjudgment interest, costs, and attorney's fees to the extent allowed by law.

254. Fault is to be allocated among the parties and any other responsible persons in accordance with AS 09.17.080. Plaintiffs are presently aware of no responsible person other than the Defendants identified in this Complaint, subject to the distinction that certain post-accident entities are named on successor, transferee, joint-enterprise, and alter-ego theories rather than on the allegation that they directly caused the crash.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Joanna Radford, Eric Radford, and Warren Titus respectfully request that this Court enter judgment in their favor and against Defendants and grant the following relief.

(A) Compensatory damages in amounts to be determined by the jury.

(B) Economic and noneconomic damages to the fullest extent permitted by applicable law.

(C) Punitive damages against each Defendant as to whom the evidence satisfies AS 09.17.020.

(D) Prejudgment and postjudgment interest as allowed by law.

(E) Taxable costs and attorney's fees recoverable under applicable law.

(F) Allocation of fault among responsible persons in accordance with AS 09.17.080.

(G) All other and further relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED this 17th day of August, 2026.

Respectfully submitted,

**MCDONALD & CODY**

**[e-sig] Thomas L. Hatchett, III**

By: ____________________________
**Gus McDonald**
Georgia Bar No.488795
gus@mcdonaldcody.com

**Thomas L. Hatchett, III**
Georgia Bar No. 870086
bo@mcdonaldcody.com
**Patrick Dawson**
Georgia Bar No. 005620
pat@mcdonaldcody.com

4005 Hwy 365 South
Alto, GA 30510
706-778-5291

Attorneys for Plaintiffs
**Motion and Application for Permission to Appear and Participate filed herewith/ To Follow**